IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

NEWTON ADAIR                                                    PLAINTIFF


        v.                      CIVIL NO. 18-2113


NANCY A. BERRYHILL, Commissioner
Social Security Administration                          DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Newton Adair, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.    **Procedural Background:**

Plaintiff protectively filed his current application for DIB on January 7, 2016, alleging an inability to work since October 10, 2015, due to colon cancer in remission, back problems, bilateral knee problems, left and right shoulder problems, Type 1 diabetes, and heart problems.  (Tr. 216).  An administrative hearing was held on August 23, 2017, at which Plaintiff appeared with counsel and testified. (Tr. 37-69).

By written decision dated September 15, 2017, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 17).   Specifically, the ALJ found Plaintiff had the following severe impairments:

1

hypertension, coronary artery disease status post myocardial infarction in 2009, degenerative disc disease at L4-5 and L5-S1 status post fusion at L5-S1, degenerative joint disease of the knees, depression and anxiety. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) except the claimant is able to perform work with simple tasks and simple instructions and incidental contact with the public. He can occasionally bend, stoop and squat.

(Tr. 19). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a price marker, a plastics molding machine tender and a routing clerk. (Tr. 28).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on May 10, 2018. (Tr. 1-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 11, 12).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of the administrative hearing held before the ALJ on August 23, 2017, Plaintiff testified that he was fifty-four years of age and had a tenth grade education. (Tr. 43-44). A review of the record revealed Plaintiff's past relevant work consists of work as a cement mason, a concrete form builder, a framer carpenter and a carpenter labor supervisor. (Tr. 65-66).

2

The pertinent medical evidence for the time period in question reflects the following. On October 8, 2015, Dr. James H. Buie noted Plaintiff complained of pain and discomfort involving his knee. (Tr. 553-554). Dr. Buie noted he saw Plaintiff on September 8th, and administered an injection to the knee. Plaintiff reported no significant improvement in his pain. Dr. Buie also noted Plaintiff had fallen and hurt his elbow. Plaintiff was assessed with advanced degenerative arthritis laterally. Dr. Buie noted Plaintiff wanted a total knee arthroplasty, but Dr. Buie indicated other treatment options should be explored first.

On October 15, 2015, Plaintiff was seen by Gayle D, Johnson, FNP, for a follow-up for coronary artery disease and hypertension. (Tr. 535-537). Nurse Johnson indicated Plaintiff was stable from a cardiology viewpoint.

On October 15, 2015, Plaintiff was also seen by Dr. Beena Syed for a follow-up appointment. (Tr. 506-510). Dr. Beena noted Plaintiff had chronic right knee pain secondary to degenerative disease. Plaintiff reported his pain was localized to the right knee. Dr. Syed recommended OxyContin, but Plaintiff's insurance would not pay for it and Plaintiff could not pay for it on his own. Plaintiff requested a different medication. Plaintiff was assessed with a chronic pain disorder and right knee pain secondary to arthritis of the right knee and prescribed medication. It was recommended that Plaintiff exercise, lose weight and return in four weeks.

On November 12, 2015, Plaintiff was seen by Dr. Syed for a follow-up appointment for his right knee. (Tr. 511-516, 697). Plaintiff reported he fell one week ago after his right knee buckled and he lost his balance. Dr. Syed noted Plaintiff was not a suitable candidate for knee surgery at the time. Dr. Syed noted Plaintiff's constant pain was localized to his

3

right knee.    Dr. Syed opined Plaintiff's pain was causing significant psychosocial dysfunction.    Dr. Syed noted Plaintiff's diabetes and hypertension were well controlled. Plaintiff was to use Percocet for severe right knee pain, to continue exercising and was given a pain patch sample.

On November 30, 2015, Plaintiff underwent x-rays of the left shoulder that revealed moderate left acromioclavicular spurring.  (Tr. 622-626).

On December 1, 2015, Plaintiff was seen by Dr. Syed for left shoulder and arm pain and numbness in the fingers in his left hand.  (Tr. 517-522).  Plaintiff reported the pain started a couple of days ago.  Dr. Syed noted Plaintiff went to the emergency room earlier in the day, underwent testing and was prescribed medication. (Tr. 627-661). Upon examination, Dr. Syed noted Plaintiff was unable to raise his left arm above shoulder level.  Plaintiff's knee was positive for crepitus. Plaintiff was assessed with left shoulder pain and referred to an orthopedic doctor. Plaintiff was started on controlled release morphine.

On December 3, 2015, Plaintiff entered the Mercy Hospital Fort Smith emergency room complaining of shoulder pain.  (Tr. 467-472).  Plaintiff reported three days of a marked increase in left shoulder pain.  Dr. James Cary Wilson noted Plaintiff recently underwent a MRI of the shoulder that revealed a possible focal tendon perforation and some fluid along the tendon. Upon examination, Dr. Wilson noted Plaintiff exhibited a normal range of motion with tenderness in the left anterior/lateral shoulder area.  Plaintiff was noted to have normal muscle tone and coordination.  Plaintiff was assessed with acute, left shoulder pain and an appointment to see an orthopedic doctor was set.

On December 7, 2015, Dr. Clay Riley noted Plaintiff's chief complaint was left shoulder pain. (Tr. 548-549). Plaintiff reported constant pain. Plaintiff reported he felt a pop in his shoulder and had a massage the next day. Plaintiff reported experiencing severe pain the day after the massage. Plaintiff reported shoulder surgery in 2011, and that he had done great until one week ago. Dr. Riley assessed Plaintiff with left shoulder pain and neck pain. Plaintiff received a cortisone injection.

On December 23, 2015, Plaintiff was seen by Dr. John B. Jacobs to establish care. (Tr. 426-428). Plaintiff complained of right knee and right shoulder pain. Plaintiff reported he was working part-time. Plaintiff reported he was trying to stop smoking. After examining Plaintiff, Dr. Jacobs assessed Plaintiff with knee joint pain, shoulder joint pain, atherosclerosis of the coronary artery with angina pectoris and anxiety. Plaintiff was prescribed medication. Dr. Jacobs also recommended Plaintiff seek pain management care.

On January 15, 2016, Plaintiff was seen by Dr. John Wellman to re-establish pain management care. (Tr. 562-563). Plaintiff complained of chronic lower back pain, right knee pain and right shoulder pain. Plaintiff was prescribed medication.

On January 25, 2016, Plaintiff was seen by Dr. Jacobs for a follow-up appointment for his knee pain. (Tr. 426). After examining Plaintiff, Dr. Jacobs assessed Plaintiff with anxiety, atherosclerosis of the coronary artery with angina pectoris, shoulder joint pain and knee joint pain. Plaintiff was prescribed medication.

On January 28 2016, Plaintiff reported his medication was working "fairly." (Tr. 559-561). Dr. Wellman prescribed medication.

In a letter dated February 1, 2016, Dr. Jacobs stated that while he had only seen Plaintiff twice, he believed Plaintiff and affirmed Plaintiff's decision to seek disability. (Tr. 431). Dr. Jacobs indicated Plaintiff had several health issues that made continuing to try to hold a job a dangerous proposition. Dr. Jacobs indicated Plaintiff had heart issues and had been under the care of a cardiologist in the past. Dr. Jacobs noted that Plaintiff's usual work was strenuous and put a great strain on Plaintiff's cardiovascular system. Dr. Jacobs also stated that Plaintiff's shoulder and low back pain was aggravated every time he got out of bed. Dr. Jacobs recommended Plaintiff seek disability after Plaintiff's first visit.

On March 2, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 735-737). Plaintiff reported his medication was working "ok," but the relief did not last long enough. Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Julio M. Cagungun Jr., indicated the goal was to control Plaintiff's pain to a 6 or lower.

On March 14, 2016, Dr. Jerry Thomas, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk for a total of six hours; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl; had limited overhead reaching, bilaterally; and that visual, communicative and environmental limitations were not evident. (Tr. 80-83). After reviewing additional evidence, Dr. William Harrison affirmed Dr. Thomas' opinion on July 29, 2016. (Tr. 99-102).

On March 15, 2016, Dr. Brad F. Williams, a non-examining medical consultant, opined that Plaintiff did not have a severe mental impairment. (Tr. 79). On the same date, Dr. Williams completed a Psychiatric Review Technique form opining that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation, each of an extended duration.

On March 30, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 732-734). Plaintiff reported his medication was working "ok." Plaintiff reported "nerves jumping" when he took Neurontin. Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Wellman indicated the goal was to control Plaintiff's pain to a 6 or lower.

On March 31, 2016, Plaintiff was seen by Dr. Syed for a three month follow-up appointment. (Tr. 668-671, 699). Plaintiff reported continued right knee pain. Plaintiff also reported shoulder pain. Plaintiff reported he had a MRI of the left shoulder and was told everything was fine, but still had severe pain. Plaintiff reported he went to a specialist in Little Rock in December, and received an injection. Plaintiff reported medication had not helped his depression and anxiety. Dr. Syed noted Plaintiff was also following with pain management. Upon examination, Dr. Syed noted Plaintiff exhibited a decreased range of motion of the left shoulder and crepitus of the right knee. Dr. Syed recommended a referral to psychology. It was recommended that Plaintiff exercise daily. Plaintiff was to return in six months.

On April 26, 2016, Plaintiff was seen by Dr. Keith Bolyard. (Tr. 787-788). Dr. Bolyard noted Plaintiff had known arthritis of the right knee, but recently had difficulty with the right shoulder. Upon examination, Dr. Bolyard noted Plaintiff lacked a few degrees of extension and a few degrees of collection of the right knee. Plaintiff had mild effusion and had stable medial and lateral laxity. Plaintiff's right shoulder was tender at the bicipital groove but nontender elsewhere. Plaintiff had strong external rotation, strong supraspinatus and negative forward flexion internally. Dr. Bolyard assessed Plaintiff with right shoulder pain consistent with biceps tendinitis and right knee advanced arthritis, lateral compartment, with tricompartment involvement. Plaintiff was given a right shoulder injection. Dr. Bolyard discussed with Plaintiff that he would also be a candidate for a right knee injection.

On April 27, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 729-731). Plaintiff reported his medication was working "ok." Plaintiff reported he experienced "shakes" when he took Neurontin. Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Wellman indicated the goal was to control Plaintiff's pain to a 5 or lower.

On May 25, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 726-728). Plaintiff reported his medication was working "good." Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Cagungun, indicated the goal was to control Plaintiff's pain to a 6 or lower.

On May 27, 2016, Plaintiff was seen by Nurse Johnson, for a follow-up for coronary artery disease and hypertension. (Tr. 802-804). Plaintiff reported a sharp pain across the chest area two to three times over the past six months. Plaintiff reported an episode the

previous week when he was doing strenuous activity. Nurse Johnson recommended a myocardial perfusion imaging study and an echocardiographic doppler study. Nurse Johnson also asked Plaintiff to keep a two week diary of his heart rate and blood pressure.

On June 10, 2016, and June 29, 2016, Plaintiff underwent a two-dimensional echocardiographic doppler study and a myocardial perfusion imagining study, respectively. (Tr. 804-805). After reviewing the results, Dr. Julio F. Schwarz recommended continuing Plaintiff's medication therapy.

On June 22, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 723-725). Plaintiff reported his medication was working "ok." Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Wellman indicated the goal was to control Plaintiff's pain to a 6 or lower.

On July 20, 2016, Plaintiff was seen for a follow-up and reported his medication was working "poorly." (Tr. 720-722). Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Wellman noted the goal was for Plaintiff to control pain to a 5 or lower and to improve daily activities of life and functionality. Plaintiff was warned that any further infraction of controlled substances would not be tolerated.

On August 17, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 796-798). Plaintiff reported his medication was working "fair." Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Wellman indicated the goal was to control Plaintiff's pain to a 5 or lower.

On September 1, 2016, Plaintiff complained of frequent headaches and difficulty sleeping. (Tr. 820-825). Dr. Syed noted Plaintiff thought the symptoms started soon after he

9

was prescribed diltiazem, but Dr. Schwarz's office told Plaintiff the symptoms were not due to this medication.  Plaintiff reported that he stopped taking the medication and had not had a headache.  Plaintiff reported he was able to sleep well.  Plaintiff reported he experienced occasional chest pain, but it was not related to any activity.  Dr. Syed noted Plaintiff's anxiety and depression had improved with medication.

On September 14, 2016, Plaintiff was seen for a follow-up appointment.  (Tr. 792-793, 795).  Plaintiff reported his medication was working "good."  Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar.  Dr. Cagungun indicated the goal was to control Plaintiff's pain to a 5 or lower.

On September 20, 2016, Plaintiff underwent a mental diagnostic evaluation performed by Dr. Terry L. Efird.  (Tr. 740-744).  Plaintiff reported he had applied for disability secondary to his back, knee and blood pressure.  Plaintiff reported he had also been diagnosed with depression. Dr. Efird noted Plaintiff reported a history of one inpatient psychiatric admission one year ago, as well as, outpatient mental health services through WACG.  Plaintiff reported he had last seen a mental health professional about one year ago. Plaintiff reported he had taken Xanax, as prescribed, for about one year.  Dr. Efird noted Plaintiff endorsed the ability to perform basic self-care tasks independently and that he could perform household chores but lacked motivation.  Dr. Efird assessed Plaintiff with major depressive disorder, moderate; and a generalized anxiety disorder.

With respective to adaptive functioning, Dr. Efird noted Plaintiff endorsed the ability to drive unfamiliar routes.  Plaintiff reported he had not been driving much due to nerves. Plaintiff reported he was able to shop independently and could perform activities of daily

living adequately but lacked motivation. Plaintiff reported he used Facebook daily and saw two of his adult children weekly. Plaintiff also reported visiting with his brother about every two weeks. Dr. Efird noted Plaintiff communicated and interacted in a reasonably socially adequate manner. Dr. Efird opined Plaintiff had the capacity to perform basic cognitive tasks required for basic work like activities.

On September 21, 2016, Dr. Abesie Kelly, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some areas of functioning. (Tr. 102-104). On the same date, Dr. Kelly, completed a Psychiatric Review Technique form opining that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation, each of an extended duration. (Tr. 98).

On October 12, 2016, Plaintiff was seen for a follow-up appointment. (Tr. 789-791). Plaintiff reported his medication was working "ok." Plaintiff was noted to have a decreased range of motion of the lumbar spine with a midline scar. Dr. Wellman indicated the goal was to control Plaintiff's pain to a 5 or lower.

On November 28, 2016, Plaintiff was seen for a follow-up by Dr. Schwarz. (Tr. 805-809). Dr. Schwarz noted Plaintiff was asymptomatic from a cardiology viewpoint.

On December 2, 2016, Dr. Syed noted Plaintiff had a chronic pain disorder and was being followed by pain management. (Tr. 825-831). Plaintiff asked to switch his pain management care to the clinic. Dr. Syed noted Plaintiff did not give a clear reason why but reported he had missed an appointment at the pain management clinic and was having

financial issues in pursing pain care.  Dr. Syed told Plaintiff that taking over his pain management care would not be considered until Plaintiff got a letter from his pain management doctor that his contract had been terminated.  Plaintiff was prescribed medication and asked to return in three months.

On March 2, 2017, Plaintiff was in for a follow-up appointment.  (Tr. 831-837).  Dr. Syed noted Plaintiff was compliant with his diet and medication.  Plaintiff's depression screen was noted as normal.  Dr. Syed examined Plaintiff and recommended he return for a follow up in three months.

On June 1, 2017, Plaintiff complained of a sharp chest pain.  (Tr. 838-858). Nurse Johnson noted Plaintiff thought his increased heart rate occurred more with an increase in stress level.  It was recommended that Plaintiff undergo further testing which was scheduled in July.  Plaintiff reported he would discuss his LDL with his primary care physician at his upcoming appointment.  Nurse Johnson noted that an EKG showed no new significant interval changes and that Plaintiff was maintaining a good level of physical activity.

On June 8, 2017, Plaintiff was seen by Dr. Syed for a follow-up appointment.  (Tr. 859-887).  Plaintiff complained of drainage from his left ear and some outside soreness. Plaintiff also complained of chest congestion and a cough.  Dr. Syed noted Plaintiff denied depression.  Plaintiff was examined and asked to return for a follow-up in three months.

On August 3, 2017, Plaintiff underwent a MRI of the thoracic spine  that revealed:

> Posterior extradural defects at the T2-T3 level and along the inferior aspect of the T5 level both producing at least mild canal stenosis.  Atypical in appearance and these could be bony and may need CT to confirm this.  No significant disc protrusion seen with lower thoracic disc bulges as noted.

12

(Tr. 888-889).

On the same date, Plaintiff also underwent a MRI of the lumbar spine, and cervical spine x-rays. (Tr. 890-). The lumbar spine MRI revealed:

> postoperative changes L5-S1 with some left posterior spurring abutting the left S1 nerve root slightly, unchanged from prior exam. Moderate facet hypertrophy L4-5 with canal dimensions lower normal limits. Some central left lateral bulge L3-4 with mild foraminal stenosis, slightly progressed from previous. Small left paracentral protrusions L2-3, mild thecal sac compression slightly progressed from previous.

(Tr. 891). Cervical spine x-rays revealed mild degenerative changes. (Tr. 893).

In a letter dated August 16, 2017, Dr. Jacobs noted he had a chance to visit with Plaintiff regarding his numerous medical issues. (Tr. 894-895). Dr. Jacobs indicated Plaintiff had significant musculoskeletal pathology in his mid- and lower spinal column. Plaintiff's shoulder pain and knee pain also caused problems. Dr. Jacobs indicated that due to Plaintiff's medical issues, Plaintiff was unable to obtain a comfortable position and was dependent on an opiate medication to function during the day. Dr. Jacobs opined that Plaintiff was unable to perform work activities of any sort and supported Plaintiff's attempt to attain disability.

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards

v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to

14

perform other work in the national economy given his age, education, and experience. <u>See</u> 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. <u>See</u> <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1141-42 (8th Cir. 1982), <u>abrogated on other grounds by Higgins v. Apfel</u>, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520.

**IV.    Discussion:**

Plaintiff argues the following issue on appeal: 1) the ALJ failed to fully and fairly develop the record; 2) the ALJ erred at Step Two in omitting Plaintiff's bilateral shoulder impairment from the severity analysis and conclusions, directly impacting the remainder of the Sequential Evaluation; and 3) the ALJ erred in determining Plaintiff's RFC which omitted shoulder-related restrictions as contained in the opinion evidence of non-examining and treating sources, resulting in the omission of those restrictions from the Step Five hypotheticals which are the foundation for reaching a finding of not disabled.

**A.    Fully and Fairly Develop the Record:**

The ALJ has a duty to fully and fairly develop the record. <u>See</u> <u>Frankl v. Shalala</u>, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." <u>Shannon v. Chater</u>, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." <u>McCoy v. Astrue</u>, 648 F.3d 605, 612 (8th Cir. 2011). After reviewing the

entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period.  Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

**B.    Plaintiff's Impairments:**

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p.  The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two.    See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe.  See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir.2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's]

impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").

With respect to Plaintiff's shoulders, the medical evidence reveals that Plaintiff sought treatment for shoulder pain during the relevant time period. However, as pointed out by Defendant, in April of 2016, after examining Plaintiff, Dr. Bolyard noted Plaintiff's right shoulder was tender at the bicipital groove, but non-tender elsewhere. Dr. Bolyard opined Plaintiff's examination was consistent with a finding of biceps tendinitis of the right shoulder. Plaintiff received an injection at this visit and Dr. Bolyard told Plaintiff to return as needed. The record failed to show Plaintiff returned to Dr. Bolyard for shoulder problems. Plaintiff's extremities were noted as normal in September of 2016, and December of 2016. (Tr. 822, 829). After reviewing the record as a whole, the Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

**C.    Subjective Complaints and Symptom Evaluation:**

We now address the ALJ's assessment of Plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone

17

is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. A review of the record revealed that Plaintiff was able to take care of his personal needs, do light household chores, drive, shop for groceries, attend church, mow the lawn with a riding lawn mower, prepare simple meals, use Facebook and watch television and visit with his family. Plaintiff's treating physicians also encouraged Plaintiff to exercise daily throughout the relevant time period.   In June of 2017, Plaintiff reported to Nurse Johnson that he had been able to maintain a good level of physical activity.  (Tr. 847).

With respect to Plaintiff's alleged impairments, the record revealed that Plaintiff was treated conservatively and appeared to experience some relief with the use of medication. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).

With respect to Plaintiff's alleged mental impairments, a review of the record also failed to establish that Plaintiff sought on-going and consistent treatment from a mental health provider during the time period in question.  See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity.  Accordingly, the Court

concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**D.    The ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In determining that Plaintiff maintained the RFC to perform light work with limitations, the ALJ considered the medical assessments of the non-examining agency medical consultants; Plaintiff's subjective complaints; and his medical records.  The Court notes that in determining Plaintiff's RFC, the ALJ discussed the  medical opinions of the treating and non-examining medical professionals, and set forth the reasons for the weight given to the opinions.  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining

19

physicians")(citations omitted); <u>Prosch v. Apfel</u>, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Plaintiff argues that the ALJ improperly disregarded the opinion of Dr. Jacobs who opined that due to Plaintiff's medical issues, Plaintiff was unable to perform work activities. After reviewing the record, the Court finds substantial evidence to support the ALJ's determination that Dr. Jacobs' assessment was inconsistent with his treatment notes, as well as the record as a whole. <u>Perkins v. Astrue</u>, 648 F.3d 892, 899 (8th Cir. 2011) (it is permissible for ALJ to discount opinion that is inconsistent with physician's own treatment notes). The Court further finds the ALJ adequately explained the weight given to the non-examining consultants. Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### E.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. <u>Goff v. Barnhart</u>, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a price marker, a plastics molding machine tender and a routing clerk during the time period in question. <u>Pickney v. Chater</u>, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from

vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.      Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of May 2019.

/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE